Order Entered.

David L. Bissett
United States Bankruptcy Judge

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| TIMBERLINE FOUR SEASONS UTILITIES, INC., | ) ) ) | Case No.: 2:21-bk-00125 |
| | ) | |
| Debtor. | ) ) | Chapter 11 |

## MEMORANDUM OPINION

Pending before the court are two related contested matters. First, Timberline Four Seasons Utilities Inc. (the "Debtor") asks the court to reconsider its August 5, 2021 order overruling its objection to proof of claim #4 filed by Kapitus Servicing, Inc. ("Kapitus"). Specifically, the Debtor asks this court to reconsider its finding that Kapitus's claim is supported by a judgment entered in the Commonwealth of Virginia on January 28, 2020. Additionally, the Debtor objects to Kapitus's proof of claim #4 on the grounds that the agreement upon which it is based is void for illegality.

Kapitus opposes both motions. As to the reconsideration, Kapitus contends that the Virginia state court rendered a valid judgment and that this court should enforce it. In the alternative, Kapitus argues that if the court is to reconsider its order, it should nonetheless find the agreement enforceable because Kapitus detrimentally relied upon misrepresentations of the Debtor when it entered into the agreement. The court held evidentiary hearings on the matter on June 16 and August 5, 2021 at which it heard from all concerned parties.

For the reasons stated herein, the court will grant Debtor's motion for reconsideration, but in reconsidering, will overrule Debtor's objection to Kapitus's claim.

## I.    BACKGROUND

These contested matters present a relatively complex factual scenario given the size and scope of the Debtor and its assets. This is due to pre-petition regulatory involvement of the West Virginia Public Service Commission ("PSC"), the seemingly lax business practices by former

(since removed) officer-owners of the Debtor, and relevant state court judgments in both West Virginia and Virginia.

In the 1980s, Allegheny Properties, Inc. ("Allegheny"), was a developer of the Timberline Ski Resort in Tucker County, West Virginia. As part of this development scheme, Allegheny created sewer and water systems. It then conveyed these utilities to Frederick Reichle and Frederick Herz, who immediately transferred ownership to Herz, Herz, and Reichle, Inc. Reichle and Herz then created the Debtor and transferred some, but not all, of the utilities to the new entity. As a public utility, the entity is subject to regulations of the West Virginia PSC and cannot enter into certain agreements without PSC approval under W. Va. Code. § 24-2-12. Debtor claims that in September 1985, it pledged these utilities to be owned and controlled by a public service district to be created by Tucker County. However, Tucker County did not create such a district until over twenty years later, with the formation of the Canaan Valley Public Service District ("CVPSD") in 2007.[1]

On April 28, 2017, the Debtor entered two agreements with Kapitus in which Kapitus funded the Debtor with a $130,000 payment in exchange for Debtor's future accounts receivable. Under the agreement, Kapitus was to receive daily payments of $1,374.00 from the Debtor until the point it had received payment in the amount of $169,000.[2] Herz and Reichle signed and guaranteed the agreement both personally and as corporate representatives of the Debtor. Both agreements contained clauses stating that the Debtor had all necessary authorizations and licenses and that the signers had full power and authority of the entity to enter into the agreement on its behalf. Despite this representation, the Debtor did not have PSC approval under W.Va. Code § 24-2-12.

In 2019, the PSC sought to put the Debtor into receivership and filed a petition in that regard in the Circuit Court of Tucker County, West Virginia ("Tucker County Court") in February 2019, seeking to appoint CVPSD as the receiver.[3] The Tucker County Court appointed CVPSD as

---

[1] Whether the Debtor ever transferred its assets remains an issue to be determined, if necessary, in this case. As it is not support for the claim objection at issue, however, the court need not resolve that apparent dispute at this time.

[2] Notably, the agreement further included, on the front page in bold conspicuous typeface, "Any misrepresentation made by merchant or owner in connection with this agreement may constitute a separate cause of action for fraud or intentional fraudulent inducement to obtain financing."

[3] This was after several investigations were conducted with the belief that Herz, Herz, and Reichle, LLC was diverting funds intended for the Debtor into other affiliates and had incurred monthly deficiencies in both 2016 and 2018.

receiver of the Debtor the following month. According to Kapitus, neither the Debtor, its officers, nor the CVPSD ever informed it of the receivership before it subsequently filed the civil suit in Virginia.

On May 16, 2019, Kapitus filed a civil action against the Debtor, Herz, and Reichle, in Hanover County, Virginia and obtained a default judgment (the "Judgment") on January 28, 2020. That court, after entering default against the Debtor, Herz, and Reichle, awarded Kapitus $129,606.00 plus six-percent interest and $8,250.00 in attorney's fees. The Debtor never appeared, but now seeks reconsideration here based on its assertion that the Virginia court entered default judgment without proper jurisdiction. Further, the Debtor argues that Kapitus failed to effectuate proper service because the lawsuit was served upon Herz after he had been ousted from authority.

On March 11, 2021, the Debtor filed this case under Subchapter V of Chapter 11 of the Bankruptcy Code. Debtor filed its amended plan for reorganization two weeks later. Kapitus filed a proof of claim on May 20, listing a secured claim in the amount of $146,569.75 plus interest, fees, and costs based on the aforementioned agreements. Pursuant to the agreements, Kapitus claims that it has a security interest in accounts receivable, secured by Debtor's property.[4] Kapitus perfected its security interest by filing a UCC-1 Financing Statement with the West Virginia Secretary of State on August 10, 2016.[5] On June 10, 2021, Kapitus validly renewed the Financing Statement. The following day, Debtor filed an objection to the claim in this case, alleging the agreement was unenforceable due to lack of PSC approval and seeking non-consensual confirmation of its Chapter 11 plan.

## II.   DISCUSSION

Debtor first asks this court to reconsider its order overruling the Debtor's claim objection based on the premise that the Virginia judgment is void. Specifically, the Debtor contends that the Virginia court lacked jurisdiction after Tucker County exercised jurisdiction in appointing a receiver. Additionally, Debtor asserts that the Virginia court lacked jurisdiction based on Kapitus's failure to appropriately serve the complaint. Beyond its contention that the judgment was a valid

---

[4] Invision Funding, LLC, an affiliate of Kapitus, is the party listed on the UCC-1 and UCC-3 as the secured party. Invision is authorized to file on Kapitus's behalf pursuant to the terms of the agreement. Further, both Virginia and West Virginia law permit a filing which includes only a representative of the debtor. *See* Va. Code Ann. § 8.9A-502(a)(2); W. Va. Code § 46-9-502(a)(2).

[5] U.C.C. § 9-502(d) permits a financing statement to be filed before a security agreement is made or the security interest otherwise attaches.

3

one entitled to full faith and credit, Kapitus argues Debtor cannot deny the agreement by using its own fraud as an "argument of convenience" such that the court cannot confirm the Debtor's plan without proper treatment of the claim.[6] This opinion deals only with the former, which has significant implications on the latter.

### A. The Virginia State Court Judgment is Void for Lack of Jurisdiction

The Debtor, in seeking reconsideration, argues that the Virginia state court judgment is void due to a lack of jurisdiction and thus not entitled to full faith and credit in this court. Specifically, the Debtor alleges that the Tucker County Court appointment of a receiver in March 2019 constituted an act of *in rem* jurisdiction such that Tucker County possessed exclusive jurisdiction over all assets and claims that may be made against the Debtor. Accordingly, the Debtor asserts that the Tucker County Court was the only place to bring a claim against property of the Debtor at the time Kapitus filed civil suit in Virginia. Kapitus contends that reconsideration is inappropriate because the judgment was validly rendered and entitled to enforcement in this court. Additionally, it asserts that Debtor, its officers, or CVPSD never informed it of the proceedings in Tucker County.

Kapitus correctly asserts that motions for reconsideration under Bankruptcy Rule 3008 are "an extraordinary remedy which should be used sparingly." *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.,* 148 F.3d 396, 403 (4th Cir. 1998). Further, the burden to overcome is a great one and the movant must demonstrate adequate cause for reconsideration. *Dorula v. Flanders (In re Starlight Group, LLC)*, 515 B.R. 290, 293 (Bankr. E.D. Va. 2014); *Cassell v. Shawsville Farm Supply Inc.*, 208 B.R. 380, 382 (W.D. Va. 1996). Kapitus rests their argument on the fact this motion was filed after the 14-day appeal period and thus must comply with Fed. R. Civ. P. 60(b) as incorporated by Bankruptcy Rule 9024. *In re Aguilar*, 861 F.2d 873, 874 (5th Cir. 1988). Kapitus points out that FRCP 60(b) does not allow reconsideration on the merits absent the existence of one of six factors.[7]

---

[6] Debtor's amended plan proposes transferring full title to CVSPD notwithstanding Kapitus's interest. Debtor lists no assets of the bankruptcy estate other than the right to pursue claims against the former officers for fraudulent activity, but Kapitus points out that Debtor's filed "Monthly Operating Reports" from April, May, and June of 2021 show reported cash receipts from utility customers in the amounts of $58,032.56, $65,689.31, and $55,083.26, respectively. Further, Debtor listed $76,013.86 in accounts receivable on Schedule A/B, which was filed on March 16, 2021.

[7] FRCP 60(b) states: "On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; *(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)*; (3) fraud, misrepresentation, or misconduct by an opposing party; *(4) the judgment is*

4

Its defense focuses on evidence which it claims under the second factor should have been known, stating that "Debtor's argument for reconsideration is based on facts that were known, or should have been known, at the time the issues were briefed before this Court." This attention is misplaced, however, as Debtor's basis for reconsideration actually rests primarily on the fourth factor of FRCP 60(b)—that the judgement is void.

One of the oldest principles of this nation's legal system is the respect accorded by one state to the judgments rendered in the courts of another. Appropriately, the Constitution ensured "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial proceedings of every other State." U.S. CONST. amend. IV § 1. Congress later expanded this abstention to the federal courts with the passage of 28 U.S.C. § 1738 to ensure a state judgement received full enforcement in both the remaining states and the federal courts. *Meindl v. Genesys Pac. Techs, Inc. (In re Genesys Data Techs.)*, 204 F.3d 124, 127 (4th Cir. 2000). However, the deference a federal court must grant to a state court judgment is not absolute. *Id.* at 127-28; 28 U.S.C. § 1738. "If that court did not have jurisdiction over the subject matter or the relevant parties, full faith and credit need not be given." *Underwriters Nat. Assur. Co.*, 455 U.S. 691, 704-05 (1982). If an exception to § 1738 applies, a federal court is permitted to refuse to give the judgment the preclusive effect to which it would otherwise be entitled. *Meindl*, 204 F.3d at 128 (citing *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 468 (1982)).

One such exception to the applicability of § 1738 and general res judicata is in the case of a jurisdictional defect. In West Virginia, "adjudication *by a court having jurisdiction of the subject matter and the parties* is final and conclusive . . . ." *Jefferson Cnty. Planning Comm'n v. Far Away Farms, LLC,* No. 3:09-CV-45, 2009 U.S. Dist. LEXIS 100975 (N.D.W. Va. Oct. 29, 2009) (citing *Conley v. Spillers,* 171 W. Va. 584 (1983) (emphasis added). Where a state court judgment is made without proper jurisdiction, it has no preclusive effect in a subsequent bankruptcy proceeding and cannot be enforced. *Lawler v. Kulik (In re Kulik)*, 400 B.R. 313 (Bankr. M.D. Fla. 2007). The *Kulik* court held that in applying Virginia law, a Virginia court's default judgment against a debtor was ineffectively rendered due to jurisdictional defects because the debtor was never adequately served. *Id.* at 321. Accordingly, the creditor could not enforce the judgment against the debtor in

---

*void*; (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief." (emphasis added).

5

a subsequent Florida bankruptcy court proceeding. *Id.* at 320-21. A plethora of authority supports the contention that judgments rendered by a court with a defect in jurisdiction are subject to collateral attack in later proceedings.[8]

The full faith and credit statute which applies the principle to federal courts "directs a federal court to refer to the preclusion law of the State in which the judgment was rendered." *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985). Because the judgment was rendered in Virginia, this court must apply Virginia preclusion law to determine its enforceability. *Id.*; *Capital Hauling, Inc. v.* Forbes, 75 Fed Appx. 170, 171 (4th Cir. 2003). The judgment is subject to the same preclusive effect in this Court that it would receive within the Commonwealth of Virginia. *Kulik,* 400 B.R. at 319; *Allen v. McCurry*, 449 U.S. 90, 96 (1980). In Virginia, a default judgment is valid only if the court had territorial jurisdiction, subject-matter jurisdiction, and if the defaulting party was granted adequate notice to appear. *Landcraft Co., Inv. v. Kincaid*, 220 Va. 865, 870 (1980). More importantly, the Virginia Supreme Court recently reiterated in *Watson v. Commonwealth* that a judgment is void *ab initio* if: (1) it was procured by fraud; (2) the court lacked subject-matter jurisdiction; (3) the court lacked jurisdiction over the parties; (4) the judgment is of a character that the court lacked power to render; or (5) the court adopted an unlawful procedure. 297 Va. 347, 350 (2019). The application in *Watson* was derived from *Virginia-Pilot Media Cos.* in which the Virginia Supreme Court held a circuit court order null and void because it was entered without proper subject matter jurisdiction. *Virginia-Pilot Media Cos., LLC v. Dow Jones & Co.,* 280 Va. 464 (2010). The Virginia Constitution models the Federal Rules of Civil Procedure and the "lack of subject matter jurisdiction cannot be waived and such jurisdiction cannot be conferred on a court by the litigants." *Id.* at 468 (citing *In re Commonwealth of Virginia*, 278 Va. 1, 11 (2009)). Like within the federal rules, a lack of subject matter jurisdiction in Virginia court may be raised at any time. *In re Commonwealth of Virginia*, 278 at 11.

---

[8] *Vanderbilt v. Vanderbilt*, 354 U.S. 416, 418 (1957) (Divorce decree in Nevada court which did not have personal jurisdiction over the wife due to her New York domicile was ruled void and thus not entitled to full faith and credit in a New York court); *Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc.,* 734 F.2d 639, 640 (11th Cir. 1984) ("… the defendant may defeat subsequent enforcement in another forum by demonstrating that the judgment issued from a court lacking personal jurisdiction.") (citing *Hazen Research, Inc. v. Omega Minerals, Inc.,* 497 F.2d 151, 154 (5th Cir. 1974)); *Rash v. Rash*, 173 F.3d 1376 (11th Cir. 1999) (holding that Florida judgment was not entitled to full faith and credit because a New Jersey court that had jurisdiction determined that the Florida court had not when decision was rendered); *Lawler*, 400 B.R. at 321 ("…State Court was without *in personam* jurisdiction over the Debtor when it entered the Judgment Order and the Judgment Order has no preclusive effect.").

6

Additionally, a court exercising *in rem* or *quasi in rem* jurisdiction does so to the exclusion of all others. *Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456, 465-68 (1939); *Mandeville v. Canterbury*, 318 U.S. 47, 48-49 (1943). Notably, this exclusivity is not restricted to cases where property has actually been seized by the court. *Princess Lida of Thurn*, 305 U.S. at 466 (citing *Farmer's Loan & T. Co. v. Lake Street E. R. Co.*, 177 U.S. 51, 61 (1900)); *Palmer v. Texas,* 212 U.S. 118, 129 (1909). The Supreme Court in *Palmer* noted that the appointment of a receiver vests a court with jurisdiction regardless of whether the receiver has taken actual possession of the property. 212 U.S. at 129-30. Importantly, "the settled rule with respect to suits in equity for the control by receivership of the assets of an insolvent corporation" is that jurisdiction of a later court yields to the jurisdiction of the original appointing court. *Penn General Casualty Co. v. Pennsylvania*, 294 U.S. 189, 195 (1935).

With these considerations in mind, the court finds two jurisdictional defects with the Virginia court's judgment. The judgment is thus not entitled to full faith and credit. Specifically, the Virginia court entered default judgment against the Debtor on January 28, 2020. Notably, this date is several months after the Tucker County Court exercised jurisdiction over the Debtor and its assets under W. Va. Code § 24-2-7(b) when it appointed a receiver in March 2019. It is the Debtor's contention—and this Court agrees—that the Tucker County Court was vested with exclusive jurisdiction in March 2019.[9]

Under the principles established by the Supreme Court over a century ago in *Palmer*, the Tucker County Court acquired exclusive jurisdiction over the Debtor's assets when it appointed a receiver such that any subsequent claims against the Debtor and its assets had to be brought in the Tucker County Court. A judgment without proper jurisdiction is entitled to no enforcement mechanism, whether intrastate or elsewhere. As such, a judgment rendered without jurisdiction in Virginia is void and not entitled to full faith and credit in a Virginia court, this court, or in any court across this nation.

---

[9] Despite the Tucker County Court's jurisdiction over the Debtor and its assets, the filing of bankruptcy by the Debtor and subsequent filing of proof of claim by Kapitus allows this court to rule on the matter notwithstanding that court's exercise of *in rem* jurisdiction. By filing a proof of claim, the creditor submits itself to the equitable jurisdiction of the bankruptcy court. *Langenkamp v. Culp*, 498 U.S. 42, 44-45 (1990). The filing of a proof of claim confers upon this court personal jurisdiction over the claimant in addition to conveying subject matter jurisdiction over the claim. *Id.* Bankruptcy courts are vested with the jurisdictional power to "hear and determine all cases under title 11 and all core proceedings arising under title 11." 28 U.S.C.S. § 157. Accordingly, this Court is able to exercise jurisdiction over claims against the estate in such circumstances.

Additionally, the record reflects that although Kapitus served Herz, it failed to effectuate service on the Debtor post-receivership. As the Debtor notes, service was made only by certified mail to Herz after he was ousted as an officer of the entity. It appears that neither the Debtor nor receiver was properly served, a requirement for personal jurisdiction. In considering both federal law and the law of the Commonwealth of Virginia, this court is well convinced that the judgment rendered by a court without jurisdiction antecedent to filing of the matter would not be enforced by a Virginia state court, and accordingly is not to be enforced by this court. While this court is cautious to overturn a state judgment in light of its duty to grant full faith and credit to validly rendered judgments of other courts, it is clear here that the Virginia court did not render a valid judgment.

Based on the foregoing, the court will grant the Debtor's motion to reconsider and ultimately set aside the Virginia judgment because the judgment is void as to the Debtor. The court will now undertake disposition of the Debtor's claim objection. In that regard, the parties previously conceded that the record is complete.

### B.    The Agreement Entered Without PSC Approval is Enforceable

Debtor argues that Kapitus cannot enforce the agreement because the Debtor did not obtain prior PSC approval despite its agents representing that it had obtained or would obtain the necessary government authorizations. Debtor's argument in this regard relies upon *Lockard v. Salem*, 127 W. Va. 237 (1944). Kapitus contends that, unlike the Debtor, it is not in the utility industry and beyond the misrepresentations made by the Debtor and its agents, it had no knowledge of these requirements. It further asserts any requirement to obtain approval was placed upon the Debtor under the agreement, if not also under state law. This opinion will later address the effects of those misrepresentations on enforceability generally, but this court, based upon the analysis that follows, is of the opinion that Kapitus may still enforce the agreement.

Notably, most of the authority on this point addresses either public utilities unilaterally raising rates without state authority or contracts between two public utilities, service districts, or other providers of public resources. As a public utility, Debtor is regulated by the state of West Virginia and more specifically, the provisions of W. Va. Code Ch. 24. The Supreme Court of Appeals of West Virginia elaborated in 1919 that when a business entity "becomes so closely and intimately related to the public . . . as to make welfare of the public . . . dependent upon the proper conduct of such business, it becomes subject for the exercise of the regulatory power of the state."

8

*Clarksburg Light & Heat Co. v. Public Serv. Comm'n*, 84 W. Va. 638, 646 (1919). Further, private contract rights may yield to the powers of the state to regulate matters of public welfare when the contract involves a public utility. *Manigault v. Springs*, 199 U.S. 473 (1905); *Atl. C. L. R. Co. v. Goldsboro*, 232 U.S. 548 (1914). Although originally privately owned and managed, the Debtor is nevertheless subject to state regulation as the provider of a public utility.

Pertinent to the agreement that Kapitus now seeks to enforce, contracts entered into by a public utility to sell or otherwise dispose of "franchises, licenses, permits, plants, equipment, business, or other property" require PSC approval. W. Va. Code § 24-2-12. Any contract in which the public entity fails to obtain such approval is void "to the extent that the interests of the public in [West Virginia] are adversely affected." *Id.*; *see City of S. Charleston v. W. Va. PSC*, 204 W. Va. 566 (1999). Effectively, a contract executed by a West Virginia public service entity without prior PSC approval is void, but only to the extent it is contrary to the public interest. *Compare with* Cal. Pub. Util. Code § 851(a) ("Every sale, lease, assignment, mortgage, disposition, encumbrance, merger, or consolidation made other than in accordance with the advice letter and approval from the commission authorizing it *is void*.") (emphasis added), Mo. Rev. Stat. § 393.220 (". . . shall be void, unless an order of the commission authorizing [indebtedness] shall have been obtained from the commission prior to such issue"). California, Missouri, and several other states render all contracts without public service commission approval void without exception, whereas West Virginia grants some limited freedom from this stringent prohibition.

The court finds the Debtor's reliance upon *Lockard* in an attempt to contravene this freedom to be misplaced. In *Lockard*, West Virginia's highest court held a lease of a city's municipal water system to a private individual for operation to be outright void under § 24-2-12 because it lacked PSC approval. 127 W. Va. at 246.[10] The court's analysis focused on the fact that the transaction was in the form of a municipality's lease of a public utility to be operated by a private individual in ruling to invalidate the agreement. *Id.* The case here, however, deals with a financing agreement in which the Debtor continued controlling and operating the utility, rather

---

[10] The court nevertheless allowed the plaintiff to recover expenses, stating
> [i]t would be decidedly inequitable for (the city) to accept the benefit of plaintiff's expenditures of money and services without any compensation therefor in view of the fact [the] defendant itself, through its own inaction and lack of diligence, was partly responsible for plaintiff's failure to obtain the consent and approval of the [PSC] to the lease in question.

*Lockard*, 127 W. Va. at 246. Despite Debtor's reliance upon *Lockard*, this line of thinking runs contrary to the Debtor's argument and instead supports the position that the public entity is the party responsible for obtaining PSC approval.

than leasing it to a private individual. In sum, Kapitus funded the Debtor in the short term and rather than taking ownership of the Debtor, was to be paid at a daily rate over time until the loan was recouped in whole. For this reason, *Lockard* is easily distinguishable. The court must also note that unlike the city municipal water system there, the Debtor (at least as far as Kapitus was aware) was still privately held and run by Herz and Reichle at the time of the agreement. Notwithstanding the important factual distinction above, this court finds the dissent's analysis of the voidability language to be more in line with prevailing state case law.

> Under the holding of the majority opinion, regardless of whether a contract of the kind here considered has any effect on the public interest, adverse or otherwise, it is wholly void in the absence of approval by the Public Service Commission. I do not think the Legislature intended any such result. It is reasonable to say that the converse of the rule laid down in the statute would be true: that *if the contract does not affect the public interest, or if the public interest is favorably affected, that the ban of the statute has no application and that such contract is valid and enforceable.*

*Id.* at 247-48 (Lovins, J., dissenting) (emphasis added). This court finds that the plain language of the statute more closely leads to the conclusion drawn by Judge Lovins, rather than that of the majority in *Lockard*.

In addition to the statutory language providing that a contract without PSC approval is void only to the extent it is contrary to public policy, the state's highest court has held that an otherwise valid contract which does not have PSC approval is nevertheless "binding on the parties to it until a departure from such contract has been directed by competent authority." *Preston Cnty. Light & Power Co. v. Renick*, 145 W. Va. 115, 129 (1960) (citing 43 Am. Jur., Public Utilities and Services, Section 98); *see City of Benwood v. Public Serv. Comm'n*, 75 W. Va. 127 (1914). Although the PSC placed the Debtor in receivership and supplanted Herz and Reichle from leadership by seeking the appointment of CVPSD, neither party has alleged on the record that the PSC stated a position as to the extant agreement's enforceability. Accordingly, under *Preston Cnty. Light & Power Co.*, the agreement is still binding on the parties so long as it is a valid and enforceable contract notwithstanding the lack of PSC approval.[11] This court finds no other grounds upon which to invalidate the contract.

---

[11] It is worth noting that in the past, the PSC has retroactively acted to approve agreements that were entered and performed before seeking PSC approval. *Morgantown Utility Bd and Scotts Run PSD*, Case No. 13-0732-S-PSD-PC, 2014 W. Va. PUC LEXIS 2272 (W. Va. P.S.C. Oct. 24, 2014). The PSC there held that a merger agreement between two West Virginia sewage districts entered without PSC approval and carried out prior to seeking approval

10

Ultimately, it appears the only shortcomings within the agreement were the result of misrepresentations by the Debtor, through its agents. Nothing in the record insinuates that these shortcomings are attributable to Kapitus's actions or that the public served by the utility suffered any detriment as a result of the agreement. If anything, the detriment to the public as a result of alleged mismanagement was offset to some degree by the financing provided by Kapitus. In sum, the agreement is valid notwithstanding the lack of PSC authority.

### C.     Debtor's Misrepresentation Renders the Contract Voidable

Notwithstanding the enforceability of the contract despite lack of PSC approval as set forth above, the court finds it necessary to still consider the allegations of fraud and misrepresentation and their impact here. Debtor seeks to hide behind the alleged fraud of its former officers in order for this agreement to be rendered unenforceable under West Virginia law. As previously established, the record indicates that the Debtor obtained Kapitus's mutual assent by the contractual misrepresentations of the Debtor that its agents had authority to enter into the agreement and that all necessary government licenses and authorizations necessary for the contract were (or would be) acquired. The parties appear to agree that neither of these representations were accurate. The Debtor, however, argues that it was defrauded by its own officers and thus is just as much—if not more—a victim as Kapitus. It is this court's opinion, under prevailing ideas of equity and contract law that this cannot be the result.

As is well established under West Virginia law since the state's inception, "[a]ny contract, the making of which is induced by fraud of either party practiced upon the other at the time the contract is made, or while negotiations in regard to it are being carried on, is voidable, and may be rescinded at the election of the party defrauded." *Cunningham v. Legrand*, No. 2:11-cv-0142, 2012 U.S. Dist. LEXIS 77778, at *19 (S.D. W. Va. June 5, 2012) (citing *Engeman v. Taylor*, 46 W. Va. 669 (1899)). This is the case whether the mistake is deliberate or the result of purportedly innocent mutual mistake. In the event where a mutual mistake "as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake." *First Am. Title Ins. Co. v. Firriolo*, 225 W. Va. 688, n.5 (2010) (citing *McGinnis v. Cayton*, 173 W. Va. 102

---

nevertheless presented no evidence that failure to obtain approval had in any way adversely affected the public interest. *Id.* at *14-15. In applying § 24-2-12, the PSC approved the agreement nearly two years after it was entered in to. *Id.* at *21-22. This further supports the proposition that if the agreement is not contrary to public policy, it is not void until the PSC renders it as such.

11

(1984)); Restat 2d of Contract, § 164; *see also Herrod v. First Republic Mortg. Corp.*, 218 W. Va. 611 (2005). The party seeking to have the contract rendered voidable must show: (1) that there was a misrepresentation; (2) that the misrepresentation was either fraudulent or material; (3) that the misrepresentation induced the recipient to enter into the contract; and (4) that the recipient's reliance on the misrepresentation was reasonable. Restat 2d of Contract, § 164.

The mistake here does not appear to have been mutual, as the record alludes to the conclusion that the Debtor (or Herz and Reichle on its behalf) knowingly misrepresented to Kapitus that the agreement would have PSC approval when it did not.[12] Notably, Clause 2.2 of the contract states "Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged. Further, Clause 2.3 represents that "Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized." As Debtor and its officer in fact did not have state approval under W. Va. Code § 24-2-12, this Court finds that those clauses amount to a material representation by the Debtor.

Specifically, it is not reasonable that the burden to ensure PSC approval would fall upon the private corporation rather than the public entity regularly subject to the regulation of the PSC. The language of Clause 2.2, that the Debtor was "in compliance and shall comply" with all governmental requirements appears to adopt this duty as that of the Debtor. Where the Debtor's owner-officers asserted in the agreement that necessary authorization was obtained, further inquiry is not necessary. Rather, the Debtor bears the burden of this failure. This proposition is further supported by the court's dicta in *Lockard*. 127 W. Va. at 246 (holding that it would be inequitable to punish the individual when the failure to obtain PSC approval was partly attributable to "defendant itself, through its own inaction and lack of diligence . . . ."). The Debtor cannot now seek to invalidate the agreement because of the fraud of its own officers. This court finds it to be a reasonable conclusion that Kapitus reasonably relied upon Debtor's representation that authorization had been acquired when the parties entered the agreement.

---

[12] Notably, Herz and Reichle are not parties to this contested matter. Without rendering judgment as to Herz and Reichle, the court's finding that they made a knowing misrepresentation on behalf of the Debtor is based on the concession of the Debtor as it pertains to the claim objection. The court's finding shall not have preclusive effect in subsequent litigation.

Debtor further asserts that, in essence, because complaints had been filed against the Debtor before the agreements and that the PSC hearings on these matters were public record, Kapitus was on inquiry notice of possible fraud committed by the officers. As West Virginia's highest court held in *Reed v. Bachman*, inquiry notice "charges the purchaser with notice, not merely of facts on the face of the title papers, but also with notice of those facts which they suggest for prudent inquiry . . . ." 61 W. Va. 452, 464 (1907). The Debtor, in citing *Reed*, neglects the application of the doctrine in that case, which held that a title informing lessees that the land was held in a joint estate put the parties on inquiry notice that there may be another party of interest. *Id.* at 465-67; *see Janvey v. GMAG, LLC*, 592 S.W.3d 125, 130 (Tex. 2019) ("A person is on inquiry notice when he or she is 'aware of facts that would have prompted a reasonable person to investigate.'" (citing *Inquiry Notice*, Black's Law Dictionary (11th ed. 2019)).

The Debtor's reliance on inquiry notice is misplaced. The Debtor points to several PSC hearings now included in the record which it alleges should have raised a red flag to Kapitus of possible wrongdoing by the officers of the Debtor who co-signed this agreement. Nothing on the face of the agreements signal a red flag or otherwise make Kapitus aware of the PSC proceedings or alleged fraud by Herz and Reichle.[13] Inquiry notice does not support the proposition that a financing agreement with a public utility requires a deep dive into the full history of PSC hearings of that utility. Most notably, the hearing which resulted in a recommendation of placing the Debtor in receivership did not occur until January 31, 2019—nearly two years after the agreement.

Lastly, it is worth addressing Debtor's contention that the agreement cannot be enforced because the Debtor is a victim of its own officers. As indicated by their removal and the subsequent appointment of a receiver, this may very well be true. However, the Debtor can bring the claims against those former officers that it offers to Kapitus under its current proposed plan. Debtor cites *Clark v. Milam* to support its contention that adverse domination allows it to bring such a suit. 872 F. Supp. 307 (S.D.W. Va. 1994). The court there handled a conspiracy to loot company assets and

---

[13] Of nearly 900 pages of PSC hearings included in the record, the pertinent ones relating to Herz's alleged fraud occurred after this agreement was entered in to. The Debtor points specifically to extraneous comments regarding Herz made during a PSC hearing regarding a customer rate complaint on March 13, 2017—approximately a month before the agreement. This hearing stated on the record that Debtor had distributed $368,402 to affiliates but further indicated "He is learning quickly about the legalities of operating a utility. He understands that utility revenue cannot be used to run the other affiliates . . . Mr. Herz testified that he did not understand originally that he could not take money from the [Debtor] account to support the affiliates. He has been recently instructed as to that idea." Were there any serious allegations of fraud as the Debtor contends were indicated in that record, it seems unlikely the PSC would've permitted Herz to remain in control for nearly two years beyond this hearing.

whether the doctrine permitted tolling the statute of limitations in a subsequent shareholder derivative lawsuit and is not necessarily applicable here. *Id.* at 310-13. Where both the Debtor and Kapitus were victimized by the actions of the Debtor's former owner-officers, it is not equitable that the Debtor is the party who ultimately comes away unvictimized. Kapitus carried out its end of the agreement—paying $130,000 to the Debtor—while Debtor defaulted on its obligations less than two months later. A party may not gain a benefit from a contract while simultaneously avoiding the obligations under that same contract. *United States use of Humble Oil & Ref. Co. v. Fid. & Cas. Co.*, 402 F.2d 893 (4th Cir. 1968); *see Home Base Litter Control, LLC v. Claiborne Cnty.*, 183 So. 3d 94, 101 (Miss. App. 2015). Despite this well-settled concept of contract law, Debtor's arguments to avoid the agreement due to fraud of its own former officers attempts to do just that. Kapitus carried out its end of the agreement after entering it in reliance upon the misrepresentations of the Debtor, ultimately instilling a benefit upon the Debtor in the amount of $130,000. The agreement, however, provided that Kapitus would receive future accounts receivable. These payments to which Kapitus has an interest under the agreement are the very same which the Debtor seeks to transfer to CVPSD for no return value in its Chapter 11 plan. Beyond the unconscionability of this result, it would allow the Debtor to leave unscathed from the resulting aftermath of its negligent officers. This result would leave Kapitus to bear the cost of entering into a contract in reliance upon the intentional misrepresentations of those same officers and grant an inequitable financial windfall to the Debtor and its former officers.

Accordingly, the agreement is voidable at Kapitus's discretion and may be enforced if it so chooses. Kapitus does wish to enforce the agreement, evidenced by its security agreement and contesting of the Debtor's current proposed plan which treats Kapitus's claims as invalid. Pursuant to the agreement and valid UCC-3 Continuation Statement dated June 10, 2021, Kapitus has a valid security interest in the Debtor's accounts receivable.

### III. CONCLUSION

For the foregoing reasons, the court finds it appropriate to find in favor of the Debtor as to the motion to reconsider under Fed. R. Bankr. P. 3008 because the Virginia court judgment against the Debtor is void for lack of jurisdiction. Upon reconsideration of the merits, the court finds that the agreement is voidable in favor of Kapitus and can be enforced at Kapitus's discretion. Accordingly, the Debtor's objection to Kapitus's claim is overruled. Consistent with Fed. R. Civ.

P. 58, made applicable by Fed. R. Bankr. P. 7058, the court will enter an order stating as much and will set further proceedings on the matter.